IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**JOHN SHEIL**,

     Plaintiff,

v.

**Martin O'Malley, Commissioner, SOCIAL SECURITY ADMINISTRATION,**

     Defendant.

---

## COMPLAINT WITH JURY DEMAND

---

COMES NOW the Plaintiff, JOHN SHEIL, by and through his attorney, Todd Bovo, hereby files his complaint against the Defendant by the allegations set forth below:

### I. JURISDICTION

1.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(4). This is an action authorized and instituted pursuant to of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-et.seq. (hereinafter referred to as "Title VII").

2.     The unlawful employment practices alleged herein were committed within the Judicial District of Colorado.

3.     This Court has jurisdiction over the parties and claims set forth herein.

### II. PARTIES

1

4.      Plaintiff, JOHN SHEIL, ("SHEIL") is a black male, began his employment with Defendant in its Denver Hearing Office Operations as an Attorney Adviser in 2010 and was promoted to a Supervisory Attorney Adviser in January 2015.

5.      Defendant is an agency of the federal government.  At all times material hereto, Defendant employed more than 15 employees.

6.      At all times relevant to Plaintiff's claims, the following employees had the authority to impose conditions of employment: Michael Kidd, James Wascher, and Owen Thilly.

## III. ADMINISTRATIVE PROCEDURES

7.      On or about February 8, 2023, Plaintiff contacted an EEO Counselor to file his informal Equal Employment Opportunity charge of discrimination against Defendant alleging claims of Race (Black); Color (Black); Sex (Male); Retaliation; and Hostile Work Environment under Title VII.

8.      SHEIL timely filed his formal EEO charge on these allegations on May 23, 2023, which Defendant accepted and designated as Charge No. DEN-23-0294-SSA (EEOC) and DEN-23-0601-SSA (MSPB) on June 26, 2023.

9.      Defendant served its Report of Investigation on September 6, 2023.

10.     Defendant issued its Final Agency Decision with its Notice of Rights on November 20, 2023.

11.     All conditions precedent to the commencement of this lawsuit have been complied with by SHEIL.

## IV. NATURE OF ACTION

12.     This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the

Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race, color,

and sex to provide appropriate relief to SHEIL. As alleged with greater particularity below,

SHEIL alleges that Defendant engaged in unlawful discrimination by denying promotions,

affording less favorable terms and conditions of employment, discharging or constructively

discharging employees because of race (black), color (black), and tolerating a work environment

that was hostile because of race, color, and retaliation; and retaliating against SHEIL who filed

charges of discrimination and/or opposed what he reasonably and in good faith believed were

unlawful discriminatory employment practices because of sex, race, color, and disabilities.

SHEIL was subjected to ongoing discrimination and harassment by his supervisors and the

regional office personnel, including but not limited to: yelling, belittling, humiliation, blacklisted,

harm to his professional reputation, false rumors, ostracized, excluded him from meetings

concerning matters under his responsible; removal of supervisory duties and authorities, given

less prestigious work assignments; blocked from serving on cadres, details, or other career

development opportunities; passed over for promotion; overly scrutinized; limited performance

review ratings, subjected to sham investigations by the Defendant; and he was constructively

discharged.


## IV. GENERAL FACTUAL ALLEGATIONS


13.     The hierarchy of Defendants' hearing office staff, from the lowest-paying to

highest-paying position is as follows: legal assistants, legal assistant specialists, attorney-advisers ("AA"), paralegal specialists, and senior attorney advisors ("SAA").

14.     The Denver hearing office staff are members of the National Treasury Employee Union and governed by a collective bargaining agreement.

15.     Hearing office staff are supervised by Supervisory Paralegal Specialist and Supervisory Attorney Adviser, also known as Group Supervisors.

16.     Group Supervisors report to the Hearing Office Director ("HOD").

17.     The HOD reports to the Hearing Office Chief Administrative Law Judge ("HOCALJ").

18.     The HOCALJ reports to the Regional Chief Administrative Law Judge ("RCALJ").

19.     At all relevant times at issue, the Region VIII regional office includes a Labor Relation Employee Relation ("LRER") team comprised of non-supervisory regional staff attorneys.

20.     The Region VIII LRER team reported to the Region VIII Lead Regional Attorney.

21.     The Lead Regional Attorney reported to the RCALJ.

22.     The OHO's Region VIII regional office is located one floor below the Denver Hearing Office.

23.     SHEIL was the only black male group supervisor in the Denver hearing office and management member in Region VIII from 2015 to February 2023.  He was the only black management member in Region VIII from 2017 to 2023.

24.     SHEIL enjoyed their job, the hearing office, and his co-workers, and he had career

aspirations to become an ALJ with the Defendant, following in the footsteps of his grandmother, who had been a supervisory attorney advisor and later an ALJ with SSA.

25.     SHEIL's first line supervisors were HOD Micky Corder (white female) was SHEIL's first-line supervisor from 2015 to December 2022 and Kimberly Roy (white female) from January 2023 to February 10, 2023.

26.     SHEIL's second line supervisors were HOCALJ Shane McGovern (white male) from April 2018 to April 2020; acting HOCALJ Lyle Olson (white male) was SHEIL's from May 2020 to July 2020; and HOCALJ James Wascher (white male) from August 2020 to February 10, 2023.

27.     In addition to SHEIL, the Denver hearing office had three other group supervisors. From January 2021 to November 2022, the other group supervisors were Lisa Hanley (white female), a paralegal supervisory specialist; Kimberly Roy (white female), a supervisory attorney advisor; and Austin McClanahan (white male), a supervisory attorney advisor. Ms. Hanley and Mr. McClanahan were replaced by Laura Shattuck (white female), a supervisory attorney advisor, and Luke Arrants (white male), a detailee to the supervisory attorney advisor, in December 2022 and January 2023, respectively. On or about November 2022, Jacqueline Smith, (black female) received a six-month detail as a group supervisor as part of SSA's National Leadership Development Program (NLDP).

28.     ALJ Melissa Santiago (Hispanic female) was the acting RCALJ for Region VIII from 2018 to 2019. On or around 2019, RCALJ Michael Kidd (white male) became the RCALJ for Regions VIII and X.

29.     The Lead Regional Attorneys for Region VIII was Frank Bobbitt (white male)

from 2015 to on or about March 2020 followed by Owen Thilly (white male) from April 2020 to present.

30.     Prior to the time of the events at issue in this case, SHEIL participated in statutorily protected activity by filing discrimination complaints against the Defendant. Specifically, on or about January 11, 2019, SHEIL contacted an EEO counselor to file his informal EEO charge of discrimination against the Defendant, alleging claims of Race, Sex, Retaliation, and a Hostile Work Environment under Title VII. On or about May 7, 2019, SHEIL timely filed his formal charge of discrimination against the Defendant.  Defendant accepted and designated as Charge No DEN-19-0364-SSA on July 17, 2019.  On or about July 15, 2020, Defendant issued its Final Agency Decision with its Notice of Rights.  On or about October 12, 2020, SHEIL timely filed a federal lawsuit for discrimination against the Defendant alleging claims of Race; Sex, Retaliation and Hostile Work Environment under Title VII. Case No. 1:20-cv-03057-RM-STV, which is still pending.

31.     Defendant spoke freely about SHEIL's 2019 EEO complaint.  Judge Kidd acknowledged that he knew of SHEIL's EEO complaint prior to becoming ROCALJ of Region VIII. Judge Wascher acknowledged that Mr. Bobbitt, or someone else told him about SHEIL's EEO complaint around February 2021.  He also stated that HOD Corder spoke with him about SHEIL's EEO complaint and that she did not like the way she was portrayed in the complaint.

32.     Following his 2019 complaint, SHEIL contends and still contends that he has been subject to discrimination and retaliation against by the Defendant, including SHEIL was subjected to ongoing discrimination and harassment by his supervisors and the regional office personnel, including but not limited to: yelling, belittling, humiliation, blacklisted, harm to his professional

reputation, false rumors, ostracized, excluded him from meetings concerning matters under his responsible; removal of supervisory duties and authorities, given less prestigious work assignments; blocked from serving on cadres, details, or other career development opportunities; passed over for promotion; overly scrutinized; limited performance review ratings, subjected to sham investigations by the Defendant; and he was constructively discharged.

33.     Since 2017, SHEIL complained that the regional office was targeting women, particularly women with disabilities and holding these employees to higher standards and treating them less favorably than other employees.  SHEIL reported that several women had complained to him about the sexist behavior of the lead regional attorney, Mr. Bobbitt.  SHEIL also complained that Mr. Bobbitt and the regional office were holding; including a senior attorney advisor under his supervision and three female ALJs.   SHEIL has complained to Defendant, HOD Corder, Mr. Bobbitt, HOCALJs, and OHO's Deputy Commissioner.

34.     On or about January 2020, during an LRER meeting, Mr. Thilly, Mr. Thilly stated that Carolyn Cooper, an employee under SHEIL's supervision, was performing successfully under the senior attorney advisor productivity index (SAAPI) expectation of 95% for the year, which he thought was surprising since she was "historically a low performer" and so he looked at her case reviews which are reported in the AWT.  Mr. Thilly did not review the AWT entries of any other attorneys.  Despite Mr. Thilly's opinion, Ms. Cooper had been rated with successful performance by three different group supervisors since 2015; Narissa Weber, Mary Beth Sheehan, and SHEIL.

35.     Ms. Cooper is a black female with targeted impairments and prior protected activities.  Since 2018, SHEIL has complained that the regional office was discriminating against

Ms. Cooper, because of her disabilities.

36.     On or about June 2020, during an LRER meeting, in response to a question regarding Ms. Cooper, SHEIL complained that the regional office was discriminating against Ms. Cooper.

37.     The following day, a telephone meeting was held with RCALJ Kidd, acting HOCALJ Olson, HOD Corder, Mr. Bobbitt, Mr. Thilly, and SHEIL.  The meeting began with RCALJ Kidd asserting that SHEIL's complaint of discrimination was "baseless" and told SHEIL "never to complain of discrimination again." SHEIL was so upset by RCALJ Kidd's verbal attack, he had to hang up the phone.  SHEIL called back into the meeting, where RCALJ Kidd ridiculed and continued to humiliate SHEIL and attack his co-workers, the Denver Hearing Office Management team.

38.     Following the meeting, SHEIL complained to Ms. Corder about RCALJ Kidd's behavior towards him.

39.     RCALJ Kidd, and Mr. Bobbitt, the Region VIII harassment prevention officer, failed to take action regarding SHEIL's complaint of discrimination.

40.     On or about November 2020, SHEIL reached out to Mr. Thilly regarding Ms. Cooper's performance and her request for information about filing for disability retirement. SHEIL inquired about when an employee's production index was below the "expectation" for three (3) straight months. Mr. Thilly told SHEIL that Defendant was not pushing for performance plans at the time.

41.     On or about January 2021, Mr. Bobbitt emailed RCALJ Kidd and Arlene Quinones that "[w]e are where we were with [Ms.] Cooper two years ago with the assignment of

low page count cases to pump her DWPI. We will push to implement the OPS in February – even if she files a disability retirement, it will take 2-3 months and there is no guarantee it will be approved." He then ordered Mr. Thilly to review only the cases written by Ms. Cooper for "page size."

42.     Between January 2021 and March 2021, Mr. Thilly directed SHEIL to place Ms. Cooper on a performance plan. At the time, Ms. Cooper was filing for disability retirement. SHEIL was working with Ms. Cooper on her disability retirement application, leave options, as well as reasonable accommodation options. Mr. Bobbitt and Mr. Thilly interfered with SHEIL's supervisory authorities and duties.

43.     On or about March 2021 SHEIL requested guidance from SSA's Office of General Counsel ("OGC") on the situation with Ms. Cooper.

44.     On or about March 2021, a meeting was held regarding SHEIL's request and the situation with Ms. Cooper. In attendance were RCALJ Kidd, HOCALJ Wascher, HOD Corder, Mr. Bobbitt, and HOD Corder. SHEIL was excluded from this meeting.

45.     Following the meeting, HOD Corder met with SHEIL. She told him that RCALJ Kidd had intimated her during the meeting. SHEIL was humiliated, intimidated, and apologized. HOD Corder told SHEIL that the regional office called him "confrontational" and accused him of assigning cases unfairly. HOD Corder told SHEIL to check the AWT entries for his employees, although, it was Ms. Roy's responsibility to review and "lock" the entries at the time. Although Mr. Thilly told SHEIL that he would keep SHEIL in the loop with OGC's thoughts, HOD Corder informed SHEIL that Mr. Thilly had only provided SHEIL with one of the three options that OGC had presented.

46.     On or about March 2021, SHEIL learned about SSA's Management Support Team ("MST") and asked HOD Corder if they could request a meeting with the MST regarding the Ms. Cooper situation.  The meeting request had to be initiated by the regional office.   HOD Corder told SHEIL that Mr. Bobbitt did not like using the MST.

47.     On or about March 2021, a meeting with the MST was held.  In attendance were SHEIL, RCALJ Kidd, HOCALJ Wascher, HOD Corder, Mr. Bobbitt, Mr. Thilly, Sandra Wick Mulvaney, Daniel Grunberg, Shawnte Stevinson, Daryl Bailey, and Hugh McPhil.  Ms. Wick Mulvaney from OGC recommended that SHEIL discuss leave options with Ms. Cooper before discussing any performance matters.  The regional office attempted to end the meeting without providing SHEIL an opportunity to speak.  SHEIL had to speak up for himself in the meeting since he was being ostracized.

48.     Following the meeting, HOCALJ Wascher directed HOD Corder and SHEIL to assign Ms. Cooper cases with 1,000 pages and remanded cases.  SHEIL complained to HOD Corder that he and Ms. Cooper were being set up to fail.

49.     Between January 2021 and March 2021, SHEIL and HOD Corder recommended that Ms. Cooper could work on case reviews and contact claimants regarding their manner of appearance.  Case reviews were within her position description.  During the MST meeting, RCALJ Kidd said that SHEIL could not assign such a workload to Ms. Cooper. Shortly after the meeting, the regional office assigned such a workload to a white senior attorney advisor from another hearing office.  Later, Defendant created a workload for attorneys to perform such outreach activities.

50.     On or about May 4, 2021, SHEIL contacted an EEO counselor to file his informal

EEO charge of discrimination against the Defendant alleging claims of Race, Color, Sex, Retaliation and Hostile Work Environment under Title VII. On or about August 16, 2021, SHEIL timely filed another formal charge of discrimination against the Defendant which the Defendant accepted and designated as Charge No DEN-19-0364-SSA on October 8, 2021. On or about April 27, 2022, Defendant issued its Final Agency Decision with its Notice of Rights. In his last EEO complaint, SHEIL named RCALJ Kidd and HOCALJ Wascher as the harassers and responsible management officials.

51.     Mr. Bobbitt referred the harassment investigation to Collin Worrell. Mr. Worrell was an employee under the supervision of Judge Santiago, who SHEIL has alleged was a harasser in his 2019 EEO complaint. The referral to an HPO under the supervision of an alleged harasser is in violation of Defendant's policies. Defendant failed to take any corrective actions regarding this policy violation.

52.     In July 2021, HOD Corder told SHEIL that he gave the best recommendation on the situation with Ms. Cooper and that it was resolved in the best manner for all. She told him that HOCAJ Wascher had said it was resolved in the best manner, but HOCAJ Wascher never spoke with SHEIL about it.

53.     On or about October 2022, Anna Hatch, a white female attorney advisor, under SHEIL's supervision filed for reasonable accommodations requests that included a "lower page count."

54.     Pursuant to Defendant's reasonable accommodation policies, SHEIL was the local delegated official for approving certain reasonable accommodations and recommending denials of reasonable accommodation requests for employees under his supervision.

11

55.     The Defendant's National Reasonable Accommodation Center (NRAC) was responsible for approving reasonable accommodation requests outside of SHEIL's authority and for reviewing recommended denials of reasonable accommodation requests.

56.     On or about November 2022, Mr. Thilly, serving as the regional reasonable accommodation coordinator, Mr. Thilly directed SHEIL to approve certain reasonable accommodation requests and recommend denial on other reasonable accommodation requests.

57.     Pursuant to Defendant's reasonable accommodation policies, the reasonable accommodation coordinator does not have the authority to recommend denials of reasonable accommodation requests.

58.     SHEIL informed Mr. Thilly that he was going to recommend a denial of the "lower page count" reasonable accommodation request, but for reasons than Mr. Thilly's opinion.

59.     Following SHEIL's response, Mr. Thilly emailed SHEIL containing "case law" that he purported was provided by OGC that supported Mr. Thilly's opinion.  Mr. Thilly's request for "case law" to OGC to support his opinion is in violation of Defendant's reasonable accommodation policies.

60.     Mr. Thilly told RCALJ Kidd and others that SHEIL did not want to follow his opinion and SHEIL wanted to assign a lower page count.

61.     HOD Corder initiated a discussion with SHEIL about the employee's reasonable accommodations requests, because the regional office had contacted Judge Wascher about it.

62.     Mr. Thilly and RCALJ Kidd's disclosure and discussion of Ms. Hatch's reasonable accommodation requests to other employees in the regional office and hearing office is in violation of Defendant's policies.

63.     Mr. Thilly's false accusations and rumors about SHEIL regarding the reasonable accommodation requests harmed SHEIL's reputation and harmed his promotional opportunities.

64.     Mr. Thilly submitted the recommended denial of the reasonable accommodation request for lower page count to the NRAC.

65.     In December 2022, the NRAC contacted the employee to discuss the reasonable accommodation requests.

66.     The NRAC did not consult SHEIL to discuss the recommended denial of the employee's reasonable accommodation requests, as required by Defendant's reasonable accommodation policies.

67.     Since 2017, SHEIL has complained that the regional office was targeting women, particularly women with disabilities, and holding these employees to higher standards and treating them less favorably than other employees.  SHEIL also complained that the regional office was treating him less favorably than his white co-workers as well as other black professionals in the offices.  He also complained of being retaliated against for engaging in protected activities and of a hostile work environment.

68.     SHEIL has complained about racial comments made by RCALJ Kidd.  On or about June 2021, RCALJ Kidd referred to managers being like "slave drivers." His comment occurred on the same day that Juneteenth was signed into law.  Later, RCALJ Kidd told employees to enjoy the day off and consider looking up the reason for the holiday.

69.     In addition, RCALJ Kidd claimed that he asked SHEIL about his allegations of discrimination of his employee and details about it, but no one provided any additional information.  Later, RCALJ Kidd asserted that SHEIL complained that Ms. Cooper was being

discriminated against because she was black, which is a racially biased assumption.

70.     On multiple occasions, SHEIL complained to HOD Corder that he was subject to a greater level of scrutiny than his white colleagues by the regional office.  More specifically, he complained that the regional office only looked at the productive index score (SAAPI/DWPI) for attorneys under the supervision of white supervisors, contrary to the collective bargaining agreements and MOUs with NTEU while scrutinizing the performance of employees and ignoring factors beyond the employee's control for employees under SHEIL's supervision. For example, SHEIL discussed how one white female advisor attorney under Mr. McClanahan's supervision was consistently producing a low number of decisional drafts each month, but the regional office did not look at the number of cases, page sizes, or AWT entries of attorney under the supervision of Mr. McClanahan or Ms. Roy.

71.     SHEIL complained to HOD Corder that during LRER meeting, the regional office displayed a clear bias toward women, such as, questioning if a woman had "personal problems" if a female attorney had a low monthly SAAPI/DWPI, while they had no concerns when a white male attorney had a low monthly SAAPI/DWPI, because "he has history of good performance" and made comments about assigning the male attorneys cases to increase their SAAPI/DWPI the next month.  SHEIL also complained to HOD Corder that male attorneys were provided mentors for several months before they were placed on a performance plan.  For example, Ms. Roy served as a mentor for a male senior attorney advisor in another office from at least September 2020 to January 2021.  However, Ms. Cooper was not offered a mentor.

72.     In September 2022, OHO Deputy Commissioner (DC) Joe Lytle visited the Denver hearing office and solicited feedback from the Denver hearing office management team.

SHEIL complained to DC Lytle about the regional LRER teams; specifically, how the regional LRER teams provide inconsistent guidance; the LRER teams fall under the regional offices unlike the SSA counterparts that fall under the Office of Labor Management and Employee Relations (OLMER); they do not always provide objective advise, and there are no reasonable alternatives if a supervisor disagrees with the LRER. SHEIL also complained to DC Lytle about the marginalization of minorities, particularly women, and how RCALJ Kidd had intimidated managers by yelling at them. DC Lytle failed to take any action regarding SHEIL's complaint.

73. Since January 2019, SHEIL supervisory duties were removed and limited. The supervision of the attorney advisors and senior attorney advisors were split up between SHEIL, Mr. McClanahan, and later, Ms. Roy when she became a group supervisor in 2021. SHEIL was primarily responsible for supervising a group of attorney advisors and senior attorney advisors and assigning work assignments to all attorneys, including those under the supervision of Mr. McClanahan and Ms. Roy. SHEIL and Mr. McClanahan shared the assignment of CEO reviews with the attorney advisors. SHEIL was responsible for assigning work to them in a manner to make sure all attorneys had an opportunity to perform successfully. In or about late 2021, SHEIL was responsible for locking the AWT entries for all attorneys and performing the end-of-month reports. SHEIL monitored all the attorney's productivity and production index throughout the month and made work assignments accordingly. SHEIL also kept track of factors beyond an employee's control for all attorneys and informed Ms. McClanahan and Ms. Roy prior to the LRER meetings about such issues. SHEIL was also responsible for assigning case reviews to senior attorneys. HOCALJ Wascher would consistently email Mr. McClanahan and Ms. Roy about matters under SHEIL's area of responsibility.

74.     Prior to January 2019, SHEIL served on a number of cadres, including the Employee Engagement Cadre (EET) where he was the lead of a subgroup that held discussions with all of the OHO's executive team regarding leadership and communication.  In addition, he served on mentoring cadres and training cadres.  Since January 2019, SHEIL was denied cadre and detail opportunities.

75.     Since January 2019, SHEIL's co-workers, Ms. McClanahan and Ms. Roy served on the regional HACPS cadre.  Ms. Roy also served on the employee engagement team cadre.

76.     Other white attorneys in the Denver hearing office and Region VIII regional office would receive details and cadre opportunities. A white female attorney from the Denver Hearing Office received a detail to OGC, a white male attorney from the Denver Hearing Office received a detail to OCALJ, and a white female attorney from the Region VIII regional office received a detail to HOD of the Seattle Hearing Office.  Ms. Roy received a multi-year detail as a senior attorney advisor while working in the regional writing unit.  On or about October 2020, at the conclusion of her detail, HOD Corder stated the regional office went "to bat" for Ms. Roy to keep the detail. In December 2022, Mr. McClanahan received a detail to the national HACPS cadre.

77.     On multiple occasions, including in November 2022, HOD Corder told SHEIL that he could not receive an overall 5 on his performance reviews, because "it has to go to the regional office." White employees and employees who did not engage in protected activities could receive an overall 5.  Ms. Roy received an overall 5 for FY21 during her detail as an SAA in the regional decision writing unit, and she received a QSI as an award, a step/pay increase.

78.     On or about November 30, 2022, a regional management meeting was held to discuss the transition of the LRER team into a national unit.  In attendance were all the hearing

office managements teams and regional office managers of Regions XIII and X.   Mr. Thilly facilitated the meeting and discussed that regional LRER teams were being merged into a central LRER team under a different component and the merger was going to happen by March 2023.

79.     During the meeting, Dan Chase, the HOD of the Salt Lake City Hearing Office stated that he was opposed to this change.  HOD Chase said that he worked in the Operations component of SSA for 19 years and all personnel matters had to be vetted by OCREO.  He disliked that cautious approach and was glad he did not have to deal with OCREO or the cautious approach when working with the Region VIII LRER team.  SHEIL has complained about the regional office and LRER team's lack of respect for EEO matters on multiple occasions.   SHEIL applied and was not selected for four (4) positions in Region VIII since 2018.  Defendant selected an employee outside SHEIL's protected class for each position; three white males and a white female and these employees have not engaged in prior protected activities and had less experience with the Defendant than SHEIL and were less qualified than SHEIL.

80.     On multiple occasions, including in November 2022, HOD Corder told SHEIL to ask for the Denver HOD position as part of his pending lawsuit settlement, because the regional office would not select him, because he engaged in protected activities.  HOD Corder requested that SHEIL ask for the Denver HOD position as part of the lawsuit settlement, because she really wanted him to get the position, because she thought he was more than experienced for the position.  She told SHEIL that Ms. Roy did not have enough experience with only two years of group supervisor experience.

81.     SHEIL applied and was not selected for four (4) positions in Region VIII since 2018.  Defendant selected an employee outside SHEIL's protected class for each position; three

17

white males and a white female. These employees have not engaged in prior protected activities, had less experience with the Defendant, and were less qualified than SHEIL. He was forced to withdraw from one application, the Region VIII lead attorney position. After selecting an interview time, Judge Santiago, one of the interview panelists, said that she was not available. The only time offered to SHEIL for another interview was 7:00 am. SHEIL asked for another interview time and was told that 7:00 am was the only time available. As a result, SHEIL withdrew, because he could not interview at that time.

82.     On multiple occasions, including in November 2022, HOD Corder told SHEIL to ask for the Denver HOD position as part of his pending lawsuit settlement, because the regional office would not select him, because he engaged in protected activities.

83.     On or about November 17, 2022, SHEIL applied for a promotion to the Supervisory Attorney Advisor (Regional Attorney) position, GS-0905-14, advertised under Vacancy Announcement #S1-11715153-23-IVOL-SJ-62 in Denver, Colorado.

84.     Defendant determined that SHEIL was qualified for that position and scheduled him for an interview.

85.     At various times, HOCALJ Wascher spoke with Mr. McClanahan, Ms. Roy, and another applicant (white male) about their interest in the Denver HOD position. HOCALJ Wascher never spoke with SHEIL about his interest in the Denver HOD position.

86.     On or about December 5, 2022, SHEIL was interviewed by HOCALJ Wacher; Joy Jenkins, Region X Regional Management Officer; and Kelly McNeff-Robinson, HOD of Portland, Oregon Hearing Office via video conferencing using Microsoft Teams.

87.     On or about December 5, 2023, HOD Corder directed SHEIL and Ms. Roy to

18

develop a management plan due to Mr. McClanahan receiving a detail. SHEIL and Ms. Roy decided that SHEIL would supervise the scheduling unit until at least the New Year, since he had four years of experience supervising the scheduling unit and she had no experience with the scheduling unit. HOD Corder agreed with their plan.

88.     On December 12, 2023, HOCALJ Wascher removed the scheduling unit from SHEIL's duties and assigned it to Laura Shattuck, (white female). Ms. Shattuck was a new group supervisor with an effective date of December 19, 2023, and she had no experience with the scheduling unit. The scheduling unit and the scheduling unit supervisor work closely with the regional office.

89.     On or about December 29, 2022, HOCALJ Wascher informed SHEIL that he was not selected for promotion for the Supervisory Attorney Advisor (Hearing Office Director) position, GS-0905-14, advertised under Vacancy Announcement # S1-11715153-23-IVOL-SJ-62 in Denver, Colorado.

90.     Defendant selected an employee outside SHEIL's protected class for the Hearing Office Director Position. Specifically, they selected Kimberly Roy, a white female employee for the position. Unlike SHEIL, Ms. Roy had not engaged in any prior EEO activity.

91.     On December 29, 2022, following the conversation with HOCALJ Wascher, SHEIL had a phone conversation with HOD Corder. SHEIL told HOD Corder that he had no choice, but resign following the non-selection for the Denver HOD position, because of the ongoing harassment and discrimination from the regional office and lack of career opportunities as a result of the regional office blacklisting him.

92.     HOD Corder stated to SHEIL that "I would quit too if I were you."

93.	HOD Corder asked SHEIL if he wanted her to talk to HOCALJ Wascher about their conversation and he replied that it was fine for her to talk with him.

94.	On December 30, 2022, HOD Corder told SHEIL that she spoke with HOCALJ Wascher about SHEIL's pending resignation and he said that it was "understandable." HOD Corder told SHEIL that she was unhappy with HOCALJ Wascher's response; he does whatever the regional office wants, and he does not do what is best for the hearing office.

95.	Again, SHEIL told HOD Corder that he was left with no choice, but to resign, because of the ongoing discrimination and harassment from the regional office.

96.	Neither HOD Corder nor HOCALJ Wacher reported SHEIL's complaint to the regional HPO as required by Defendant's anti-harassment policies.

97.	In December 2022 and January 2023, Ms. Roy acknowledged that SHEIL was more qualified than her for the HOD position during phone calls with SHEIL.

98.	In January 2023, Mr. Thilly directed that SHEIL take action against a senior attorney advisor (white female) under his supervision due to SAAPI being lower than expected.

99.	At the LRER meeting in January 2023, SHEIL provided justification and the factors beyond the employee's control, in particularly, that the employee was one of the most experienced SAA and ALJs routinely request the employee to research and/or draft decisions on the most difficult and complex cases and the employee was involved with special projects with the regional office.

100.	Mr. Thilly ignored SHEIL's explanation and accused SHEIL of not assigning complex cases to all SAAs in a fair manner.

101.	The regional office, including Mr. Thilly, called the employee "a slow writer" and

"low performer," despite the employee's outstanding reputation, among ALJs, managers, and peers, factors beyond the employee's control, and a history of performance awards.

102.    On January 25, 2023, SHEIL went to HOCALJ Wascher's office and spoke with him in person about his constructive discharge.

103.    SHEIL told HOCALJ Wascher he was resigning.  HOCALJ Wacher replied that it "understandable" and he recommended that SHEIL take a few weeks off between jobs.  HOCALJ Wascher told SHEIL that he would recommend him for the ALJ position, which he knew SHEIL coveted, because SHEIL had extensive experience and the "right temperament" for the position. HOCALJ Wascher told SHEIL that he does what ROCALJ Kidd wants, because ROCALJ Kidd "is my boss" and he was serving as acting HOCALJ for the Salt Lake City hearing office, because ROCALJ Kidd asked him to do it.

104.    In January 2023, HOCALJ Wascher directed SHEIL to train a new supervisor detailee, Mr. Arrants (white male) and Ms. Roy decided the entire management team, except for HOCALJ Wascher, should attend the trainings, because SHEIL had extensive experience in several topics, and acknowledged that she did not have as experience in many of the areas.

105.    Between January and February 2023, SHEIL provided training to the entire hearing office management team, including Ms. Roy Ms. Shattuck, Mr. Arrants, Jacqueline Smith (a management detailee), and Janet Medina.  SHEIL presented trainings on performance management reports (DART, CPMS MI, JIM, and other reports); OHO's Standard Hearing Office Procedures (SHOP); assigning and monitoring workloads in OHO's Case Processing Management System (CPMS); fee petitions; performance reviews; time and attendance; and AWT.

106.     In January 2023, Ms. Roy directed SHEIL to provide training to the legal assistants and legal assistant specialists on how to run a query report, because she did not know how to run the specific report.

107.     On February 10, 2023, SHEIL was constructively discharged.  SHEIL had to show Ms. Shattuck how to perform his exiting interview since Ms. Roy had no experience with an exiting interview.

108.     With regards to the most recent non-selection, the Denver HOD position, SHEIL was more qualified than the selectee, Ms. Roy.

109.     The interview panel and ROCALJ Kidd provided Ms. Roy with preferential treatment; failed to follow Defendant's policies; and provided inaccurate information regarding Ms. Roy in the selection memorandum.

110.     HOCALJ Wascher discussed the HOD position with several white employees about applying for the HOD prior to the job announcement and/or interviews, but not discuss the HOD position with SHEIL.

111.     The interview panel consisted of two members outside of Region VIII, which was outside the Defendant's customary interviewing policies and practices.

112.     The interview panel and ROCALJ Kidd used the interview to determine a total score for the candidates.

113.     HOCALJ Wascher was walking around during SHEIL's interview, which SHEIL found distracting and disturbing.

114.     Judge Wascher stated that the interview panel "did not recommend Mr. Sheil be hired, primarily because we unanimously view his overall interview as lackluster, although he

answered a number of questions very well."

115. HOCALJ Wascher stated the interview panel had concerns about whether SHEIL could work effectively with the LRER team in response to SHEIL's answer to an interview question. Later, HOCALJ Wascher stated that based on SHEIL's response to a question during his interview asking how he had handled a conflict with a supervisor or subordinate, members of the interview panel were concerned that he might be unable to work effectively with the LRER team in the regional office if he were selected as the Hearing Office Director.

116. HOCALJ Wascher did not provide any explanation as to why SHEIL's answer to the interview question warranted such concerns or any specifics as to how SHEIL might be unable to work effectively with LRER team in the regional office if he was selected as the Hearing Office Director.

117. The interview did not contain any questions about how SHEIL had handled a conflict with a superior or subordinate.

118. SHEIL has never received a complaint about working effectively with the regional office's LRER team.

119. During the selection process, the interview panel and RCALJ Kidd were aware that the regional LRER Teams were being removed from the regional office and transitioning to a national unit by March 2023.

120. The only time SHEIL had problems working with the regional office and the LRER team was regarding discriminatory practices by the regional office and regional LRER team.

121. RCALJ Kidd and the interview panel gave preferential treatment to Ms. Roy.

122.    Ms. Roy did not receive the highest interview score among the candidates.  She scored 22 points lower than the highest-scoring interview candidate.

123.    The interview panel and ROCALJ Kidd gave Ms. Roy credit for her two (2) years of hearing office experience, elevating her over the highest-scoring interview candidate.

124.    SHEIL had twelve (12) years of hearing office experience compared to Ms. Roy's two (2) years. The interview panel and RCALJ Kidd gave no credit or weight to SHEIL's hearing office experience or the 10 more years of hearing office experience that he had than Ms. Roy.

125.    The Vacancy Announcement # S1-11715153-23-IVOL-SJ-62 for the Denver HOD position did not require applicants to submit a list of references.

126.    Defendant, the interview panel, RCALJ Kidd, or any member of the regional office did not ask SHEIL for a list of references.

127.    The interview panel and ROCALJ Kidd solicited three (3) references for Ms. Roy and only one (1) reference for SHEIL.

128.    For Ms. Roy, the interview panel and ROCALJ Kidd solicited references from HOD Corder as well as Mr. Thilly and the regional attorney of Region X; both Mr. Thilly and the Region X regional attorney report directly to RCALJ Kidd.

129.    RCALJ Kidd stated that Ms. Roy was rated a level 5 (highest possible) in three of the five competencies for the HOD position on her reference checks.

130.    The interview panel and ROCALJ Kidd solicited a reference from HOD Corder for SHEIL.  They did not solicit any other references for SHEIL's reference check.

131.    HOD Corder rated SHEIL as a level 5 (excellent) in all five competencies of the HOD position on the reference check.

132.    The interview panel and ROCALJ Kidd gave no credit or weight to the ratings or narratives in SHEIL's reference check.

133.    HOCALJ Wascher used subjective terms such as "laudatory" to described Ms. Roy's references and interview while using negative subjective terms, such as "lackluster" to describe SHEIL's interview.

134.    SHEIL has a Bachelor of Science in Business Administration. He previously represented claimants in disability hearings before the Defendant's ALJs, and he was an NTEU regional vice president from 2013 to 2015.  The interview panel and ROCALJ Kidd gave no credit or weight to SHEIL's college degree, prior work experience, or union representative experience.

135.    Ms. Roy does not have a business degree, she does not have experience representing claimants before SSA, and she does not have experience working as a union representative.

136.    SHEIL has been a licensed practicing attorney longer and was employed by the Defendant for longer than Ms. Roy.  The interview panel and ROCALJ Kidd gave no credit or weight to SHEIL's legal experience or years of employment with the Defendant.

137.    At the time of the selection, SHEIL had approximately eight (8) years of supervisory experience with the Defendant.  Ms. Roy had approximately two (2) years of supervisory experience with the Defendant.  The interview panel and ROCALJ Kidd gave no credit or weight to SHEIL's approximately eight (8) years of supervisory experience or six (6) more years of experience than Ms. Roy.

138.    SHEIL has received five monetary performance awards as a group supervisor

(2016, 2017, 2019, 2020, 2021) as well as five (5) exemplary individual cash awards (2016, 2019, 2021, 2022, 2022). SHEIL has asserted in his pending lawsuit, Case No. 1:20-cv-03057-RM-STV, and continues to assert that his 2018 performance review rating was lowered in retaliation for engaging in protected activities. He also was eligible for a performance award for his FY22 performance, with an overall rating of 4.7 out of 5.0. The interview panel and ROCALJ Kidd gave no credit or weight to SHEIL's performance award history.

139. At the time of the selection, Ms. Roy had no monetary performance awards as a group supervisor.

140. The interview panel and ROCALJ Kidd provided false, inaccurate, and misleading information in the selection letter regarding Ms. Roy's professional background, such as stating that Ms. Roy was promoted to an SAA when it was a detail and Ms. Roy's hearing office experience.

141. HOD Corder was aware of SHEIL's complaints of discrimination and reported it to HOCALJ Wascher. Neither HOD Corder nor HOCALJ Wascher reported SHEIL's complaints to the HPO or other units in accordance with Defendant's policies.

142. RCALJ Kidd and HOCALJ Wascher minimized SHEIL's complaints of discrimination as "unhappy, "dissatisfaction," and "disaffected." Neither of them spoke with SHEIL about his job satisfaction.

143. HOCALJ Wascher took no remedial actions following the December 29, 2022, conversation with HOD Corder. HOCALJ Wascher said it was "understandable." HOCALJ Wascher acknowledged that he knew SHEIL "might not want to work for a new Hearing Office Director who had been hired instead of him," because of what he described as SHEIL being

"disaffected about working for OHO." He claimed that he understood from a number of previous conversations with HOD Corder that SHEIL had been dissatisfied with his job for quite some time, and was, in fact, planning to leave the agency. HOCALJ Wascher never once had a discussion with SHEIL about the job, either before or after the resignation.

144.    RCALJ Kidd made false and inaccurate statements that prior to his arrival in Region VIII, SHEIL had offered a resignation but changed his mind prior to leaving. Judge Wascher made false and inaccurate statements that SHEIL submitted a resignation as a Group Supervisor in about December 2017, but that HOD Corder had refused the resignation.

145.    HOCALJ Wascher stated that prior to December 29th, he "knew Mr. Sheil had already been disaffected about working for OHO, had talked about leaving the agency, or at least requesting a voluntary demotion, and, in any event might well not want to work for a new Hearing Office Director who had been hired instead of him."

146.    Therefore, RCALJ Kidd and HOCALJ Wascher foresaw that SHEIL would resign based on the results of their actions.

147.    Meanwhile, white employees received more favorable treatment. Mr. McClanahan received a detail to the national HACPS cadre following his voluntary demotion from the group supervisor position. A white female ALJ was set to retire when she received a call from RCALJ Kidd on what would have been her last day, and she decided not to retire. RCALJ Kidd and the ALJ had previously worked together in another heatransfeferring office.

148.    SHEIL has requested a transfer in his prior EEO complaints, which were denied.

149.    Based on the abovementioned, SHEIL was constructively discharged.

150.    Following SHEIL's 2023 informal complaint, Defendant performed a sham

administrative investigation regarding SHEIL complaints of discrimination. SHEIL was interviewed by an HPO and Defendant's investigators between May and July 2023. During the interviews, SHEIL was asked a series of questions about events, including events from 2017 through 2019, which are part of the pending lawsuit without the presence of his attorney. SHEIL has not heard from the investigators or HPO since the July 2023 interview.

151. Defendant failed to take action to stop the discrimination, allowing it to pollute the workplace, and allowed it to remain unremedied for years.

152. ALJs, including RCALJs and HOCALJs, are not subject to performance standards. RCALJs and HOCALJs are not subject to Defendant's management performance standards. Further, RCALJ Kidd stated that the ALJ position is a lifetime appointment.


## V. FIRST CLAIM FOR RELIEF
### (Terms and Conditions of Employment - Title VII - Gender/Male)

153. SHEIL hereby incorporates and realleges the preceding paragraphs as if stated fully, herein.

154. The conduct of Defendant's supervisors and co-workers were intentional as alleged in the preceding paragraphs above all violate SHEIL's rights as guaranteed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et.seq.

155. Similarly situated employees who are not black males, like SHEIL have not been similarly treated.

156. As a result of the conduct of the Defendant and its agents as above-described, SHEIL has been damaged in an amount to be determined at trial, including loss of wages,

28

diminution in earning capacity, damage to his reputation, loss of opportunity for promotion, loss

of benefits, loss of opportunity for professional growth, constructively discharged, and for pain,

suffering, and emotional distress damages.

157.     SHEIL claims reasonable attorney's fees pursuant to Title VII in an amount to be

determined at trial and requests injunctive and declaratory relief, and compensatory damages for

the discrimination complained of.


## VI. SECOND CLAIM FOR RELIEF
### (Terms and Conditions of Employment - Title VII Race (Black))

158.     SHEIL hereby incorporates and realleges the preceding paragraphs as if stated

fully herein.

159.     The conduct of Defendant's supervisors and co-workers as alleged in the

preceding paragraphs above all violate SHEIL's rights as guaranteed by Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e et.seq.

160.     Similarly situated employees who are not black like SHEIL have not been

similarly treated.

161.     The conduct of the Defendant, its supervisors/managers and co-workers as above

alleged are intentional.

162.     As a result of the conduct of the Defendant and its agents as above-described,

SHEIL has been damaged in an amount to be determined at trial, including loss of wages,

diminution in earning capacity, damage to his reputation, loss of opportunity for promotion, loss

of benefits, loss of opportunity for professional growth, constructively discharged, and for pain,

suffering, emotional distress.

163.    SHEIL claims reasonable attorney's fees pursuant to Title VII in an amount to be determined at trial and requests injunctive and declaratory relief, and compensatory and punitive damages for the discrimination complained of.

## VII. THIRD CLAIM FOR RELIEF
**(Terms and Conditions of Employment - Title VII Color (Black)**

164.    SHEIL hereby incorporates and realleges the preceding paragraphs as if stated fully herein.

165.    The conduct of Defendant's supervisors and co-workers as alleged in the preceding paragraphs above all violate SHEIL's rights as guaranteed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et.seq.

166.    Similarly situated employees who are not black like SHEIL have not been similarly treated.

167.    The conduct of the Defendant, its supervisors/managers and co-workers as above alleged are intentional.

168.    As a result of the conduct of the Defendant and its agents as above-described, SHEIL has been damaged in an amount to be determined at trial, including loss of wages, diminution in earning capacity, damage to his reputation, loss of opportunity for promotion, loss of benefits, loss of opportunity for professional growth, constructively discharged, and for pain, suffering, emotional distress.

169.    SHEIL claims reasonable attorney's fees pursuant to Title VII in an amount to be determined at trial and requests injunctive and declaratory relief, and compensatory and punitive

damages for the discrimination complained of.

## VIII. FOURTH CLAIM FOR RELIEF
### (Terms and Conditions of Employment - Retaliation - Title VII)

170.    SHEIL hereby realleges and incorporates the preceding paragraphs as if stated fully, herein.

171.    The conduct acts or omissions of the Defendant and its managers/supervisors as above-alleged are directed at the SHEIL due to his repeated complaining of being treated differently, being subject to discrimination and reasonably advocating his rights under Title VII, are retaliatory and violate his rights as guaranteed by Title VII of the Civil Rights Act of 1964, as amended.

172.    Similarly situated employees who have not participated in similar activity like SHEIL have not been similarly treated.

173.    As a result of the conduct of the Defendant and its agents as above-described, are intentional, show malice or reckless indifference to SHEIL's federally protected rights and resulted in him being treated differently than other employees who did not advocate their rights and violate him rights as guaranteed by Title VII of the Civil Rights Act of 1964, as amended.

174.    As a result of the conduct of Defendant's supervisors/managers as above-alleged, SHEIL has been damaged in an amount to be determined at trial, including front pay, back pay, loss of income, diminution in earning capacity, damage to his reputation, loss of opportunity for promotion, loss of benefits, loss of opportunity for professional growth, constructively discharged, and for pain, suffering, emotional distress and compensatory damages.

175.    Plaintiff claims reasonable attorney's fees pursuant to Title VII in an amount to be determined at trial.  Further, Plaintiff requests injunctive and declaratory relief.

<u>VIIII. FIFTH CLAIM FOR RELIEF</u>:
**(Title VII - Hostile Work Environment)**

176.    SHEIL hereby incorporates and realleges the preceding paragraphs as if incorporated herein.

177.    Defendant intentionally discriminated against SHEIL with severe and pervasive acts of discrimination and retaliation, after he complained about how female employees and employees with targeted impairments were being discriminated against: Carolyn Cooper (black female) and Anna Hatch (white, female) who were under his supervision, where management wanted him to hold them to a higher standard than similarly situated male and non-disabled employees; in addition to, RCALJ Kidd's racial slurs.

178.    As a direct and proximate result of the foregoing actions and conduct of Defendant, SHEIL has suffered, and will continue to suffer, damages including but not limited to diminution of future earning capacity, including but not limited to future wage loss, loss of earning capacity, loss of reputation and damages to career; constructively discharged; and non-economic damages such as, but not limited to, compensatory damages, mental anguish, inconvenience; pre and post judgment interest, costs and expenses, attorney fees and other damages to be determined at trial.


WHEREFORE, SHEIL prays that this Court enter an Order as follows:

A.    Grant a permanent injunction prohibiting Defendant from engaging in any

employment practices which violate Title VII of the Civil Rights Act, as amended.

B.     Reinstate to SHEIL all benefits, wages, back pay, reinstatement with an appropriate promotion, or front pay in lieu of, which were lost as a result of the discriminatory and retaliatory acts directed at him.

C,     Reimburse SHEIL for all reasonable and necessary expenses incurred due to the discriminatory actions of Defendant.

D.     Award SHEIL compensatory, punitive and other damages against Defendant in an amount to be determined at trial for the personal humiliation, severe emotional pain, inconvenience, mental anguish and loss of enjoyment of life he has suffered due to the actions of Defendant;

E.     Order Defendant to stop all retaliation against SHEIL for having engaged in a protected EEO activities under, Title VII of the Civil Rights Act of 1964, as amended..

F.     Award SHEIL his costs of this action and reasonable attorney's fees, expert fees, pre and post judgment interest;

G.     Retain jurisdiction over this action to ensure full compliance with the Orders of this Court; and

H.     Grant SHEIL such other and further relief as this Court deems just and proper.


**SHEIL REQUESTS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**


DATED this ____ day of February, 2024.

Bovo Law Group


/s/ Todd Bovo

Todd F. Bovo
650 S Cherry St.
Ste 1400
Denver, CO 80246
Phone: (303) 333-4686.
***Attorney for Plaintiff***

<u>Plaintiff's Address:</u>

3061 South Irving St.

Denver Colorado, 80236

c/o Law Office of Todd Bovo